LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
ELAINE CHANG (#293937)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160
E-mail:        info@glancylaw.com

*Lead Counsel for Plaintiff Rohan Kishtagari*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROHAN KISHTAGARI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GERON CORPORATION, JOHN A. SCARLETT, and OLIVIA K. BLOOM,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rohan Kishtagari ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by GERON CORPORATION ("Geron" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Geron; and (c) review of other publicly available information concerning Geron.

## **NATURE OF THE ACTION AND OVERVIEW**

1.      This is a class action on behalf of purchasers of Geron's securities between June 16, 2013 and March 11, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Geron is a clinical stage biopharmaceutical company developing a first-in-class telomerase inhibitor, imetelstat, in hematologic myeloid malignancies.

3.      Imetelstat is the Company's sole product candidate.  According to Geron, the discovery and early development of imetelstat was based on the Company's purported expertise in telomerase and telomere biology.  Telomerase is an enzyme that enables cancer cells to maintain telomere length, which provides them with the capacity for limitless cellular replication.  Imetelstat is a potent and specific inhibitor of telomerase.

4.      On March 12, 2014, Geron disclosed that it had received verbal notice from the U.S. Food and Drug Administration (the "FDA") that its Investigational New Drug ("IND") application for imetelstat had been placed on full clinical hold, affecting all ongoing Company-sponsored clinical trials.  A full clinical hold is an order that the FDA issues to a trial sponsor to

suspend an ongoing clinical trial or delay a proposed trial.  According to the Company, the FDA indicated that the clinical hold was due to the occurrence of persistent low-grade liver function test ("LFT") abnormalities observed in the Phase 2 study of imetelstat in ET/PV patients and the potential risk of chronic liver injury following long-term exposure to imetelstat.  Also, Geron disclosed that the FDA expressed concern about whether these LFT abnormalities were reversible.  As a result, Geron informed investors that the clinical hold would affect the remaining eight patients in the Company's Phase 2 study in essential thrombocythemia ("ET") or polycythemia vera ("PV") and the remaining two patients in the company's Phase 2 study in multiple myeloma.  Also, the Company indicated that a planned Phase 2 clinical trial in myelofibrosis would likely be delayed due to the clinical hold.

5.      On this news, shares of Geron declined $2.71 per share, over 61%, to close at $1.69 per share on March 12, 2014, on unusually heavy volume.

6.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that persistent low-grade LFT abnormalities had been observed in the Phase 2 study of imetelstat in ET/PV patients; (2) that there was a potential risk of chronic liver injury following long-term exposure to imetelstat; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company and the prospects for imetelstat lacked any reasonable basis and/or were materially false and misleading at all relevant times.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Geron's principal executive offices are located within this Judicial District.

11.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

12.      Plaintiff Rohan Kishtagari, as set forth in the accompanying certification, incorporated by reference herein, purchased Geron common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.      Defendant Geron is a Delaware corporation with its principal executive offices located at 149 Commonwealth Drive, Suite 2070, Menlo Park, California 94025.

14.      Defendant John A. Scarlett, M.D. ("Scarlett") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Geron.

15.      Defendant Olivia K. Bloom ("Bloom") was, at all relevant times, Chief Financial Officer ("CFO") of Geron.

16.     Defendants Scarlett and Bloom are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Geron's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

17.     Geron is a clinical stage biopharmaceutical company developing a first-in-class telomerase inhibitor, imetelstat, in hematologic myeloid malignancies.

18.     Imetelstat is the Company's sole product candidate.   The discovery and early development of imetelstat was based on the Company's purported expertise in telomerase and telomere biology.   Telomerase is an enzyme that enables cancer cells to maintain telomere length, which provides them with the capacity for limitless cellular replication.   Imetelstat is a potent and specific inhibitor of telomerase.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     The Class Period begins on June 16, 2013.   On this day, the Company issued a press release entitled, "Updated Results from Geron's Imetelstat Phase 2 Proof-of-Concept Trial

in Essential Thrombocythemia Presented at the European Hematology Association Congress."

Therein, the Company, in relevant part, stated:

### Data from an Additional Six Months of Imetelstat Treatment and Follow-Up since ASH 2012

### Imetelstat Continues to be Well Tolerated with No New Safety Signals Reported; No Patients Have Discontinued Treatment Due to Drug-Related Adverse Events

### Hematologic and Molecular Responses are Maintained

Geron Corporation (Nasdaq: GERN) today announced that updated clinical results from the company's Phase 2 trial of imetelstat in essential thrombocythemia (ET) were presented in an oral session at the 18th Congress of the European Hematology Association (EHA) in Stockholm by a principal investigator of the trial, Prof. Dr. med. Gabriela M. Baerlocher, of the University Hospital and University of Bern, Switzerland. ET is a chronic blood disorder that is representative of a group of diseases known as myeloproliferative neoplasms (MPNs). The initial trial results from 14 patients with ET were presented at the American Society of Hematology (ASH) annual meeting in December 2012. The updated results, which showed robust hematologic and molecular responses in patients treated with imetelstat, included data for an additional six months of treatment and follow-up for the original 14 patients, as well as data from four additional patients enrolled in the trial after the data cut-off for the ASH presentation. To view the presentation slides, please visit www.geron.com/PDFs/Geron-Imetelstat-ETPh2-EHA-2013.pdf.

"The observed 100% hematologic response rate in the updated data set, accompanied by a molecular response rate of 88% among the patients who had a JAK2 V617F mutation, are consistent with the data reported at ASH last year," said Prof. Baerlocher. "Imetelstat continues to be well tolerated in this trial. With no patients on treatment losing hematologic response, and molecular responses maintained in 86% of the patients, the drug also appears to have good durability of its effects on the disease."

### Trial Rationale and Design

Geron's multi-center, single arm, open-label Phase 2 trial of imetelstat in patients with ET was designed to provide proof-of-concept for the potential use of the drug as a treatment for hematologic myeloid malignancies, including myelofibrosis (MF), myelodysplastic syndromes (MDS) and acute myelogenous leukemia (AML). The trial leveraged clinical observations from Phase 1; i.e., that imetelstat reduces platelet counts, as well as non-clinical observations that imetelstat distributes well to bone marrow in rodent models and selectively inhibits the proliferation of malignant progenitors ex vivo from patients with ET.

Published non-clinical data also suggest elevated telomerase activity in malignant progenitors and shorter telomeres in granulocytes from patients with MPNs compared to healthy controls.

The primary endpoint of the trial was hematologic response and the secondary endpoints included molecular response and safety. Hematologic responses were measured by reductions in platelet counts, which are elevated in patients with ET. Molecular mutations, such as JAK2 V617F, which occur in 50% of patients with ET and are believed to be acquired in malignant clonal progenitor cells, can be used as molecular markers of disease burden. Therefore, molecular responses were measured by reductions in JAK2 V617F allelic burden compared to the normal, or wild type, JAK2 gene in circulating granulocytes. A decrease in the proportion of JAK2 V617F relative to wild type JAK2 is consistent with selective inhibition of the neoplastic progenitor cells responsible for the disease. Hematologic and molecular responses were graded using adapted European LeukemiaNet criteria, as defined by Barosi, et al, in the journal Blood (2009).

The trial was closed to enrollment in December 2012, with a total of 20 patients enrolled: 18 with ET and two with polycythemia vera (PV). Results for efficacy were presented from all 18 ET patients enrolled in the trial, with a median time on imetelstat treatment of 14 months (range 3 months to 2.5 years), as of a May 2013 data cut-off date. At this data cut-off date, there was insufficient efficacy follow-up data available from the two patients with PV, but follow-up data for safety were included. The presentation at the ASH annual meeting in December 2012 reported data as of an October 2012 cut-off date from the first 14 ET patients, with a median time on imetelstat treatment of eight months.

### Efficacy Results

All 18 ET patients were refractory to, intolerant of or had refused conventional therapies (hydroxyurea, anagrelide and/or interferon-alpha). Platelet counts were reduced in all patients (a 100% hematologic response rate) and normalized in 16 out of 18 patients (an 89% complete response (CR) rate). The JAK2 V617F gene mutation was detected in eight patients. Seven out of the eight (88%) patients achieved 72% to 96% reductions in JAK2 V617F allele burden that qualified as partial molecular responses (PRs) within three to 12 months of treatment with imetelstat. Molecular PRs were maintained in six of the seven (86%) patients, with a median follow-up of 9.5 months (range 0 to 19 months) after first achieving a response. The median durations of hematologic and molecular response have not yet been reached.

Imetelstat was initially administered weekly by intravenous infusion during an induction phase. After achieving a hematologic CR, which occurred in a median time of six weeks, a maintenance treatment phase was begun in which dosing frequency was modified based on a patient's individual response profile. As of the May 2013 data cut-off date, follow-up data for the maintenance phase were available for 15 out of 16 patients who attained a hematologic CR. In all 15 patients the frequency with which imetelstat was administered to maintain the

response was reduced to every two weeks or less (up to every seven weeks), generally decreasing over time. 13 of the 16 patients (81%) who attained a hematologic CR remain on study as of May 2013, with the median duration of treatment of 14.5 months. As of May 2013, a total of four ET patients have discontinued study treatment. The reasons cited for discontinuation include frequency of imetelstat treatment that was required to maintain a response (n=1), co-morbid conditions/social issues (n=2) and convenience issues (n=1).

*Safety Results*

In the trial, long-term administration of imetelstat was generally well tolerated. There were no new safety signals observed in the six-month update, and no patients discontinued the trial due to drug-related adverse events. The majority of the non-hematologic adverse events were mild-to-moderate in severity, the most frequent assessed as imetelstat-related by investigators being gastrointestinal events and fatigue. No drug-related Grade 4 non-hematologic adverse events were reported.

Three patients had Grade 4 neutropenia, but no cases of febrile neutropenia were reported. No thromboembolic events or bleeding events associated with thrombocytopenia were reported.

At least one abnormal liver function test (LFT) was observed in laboratory findings in all patients. The majority were Grade 1 elevations in alanine aminotransferase (ALT) and aspartate aminotransferase (AST); two Grade 3 increases in ALT/AST were reversible on dose reduction. With longer dosing, Grade 1 increases in alkaline phosphatase were observed, associated with mostly Grade 1 to some Grade 2 unconjugated hyperbilirubinemia. LFT abnormalities do not appear to progressively worsen over time. No liver injury symptoms were reported and no patients discontinued study treatment due to enzyme elevations.

*Further Development of Imetelstat in Hematologic Malignancies*

"The molecular responses observed in the ET trial suggest that imetelstat had a relatively selective inhibition of the malignant progenitor cells, which are believed to be responsible for the underlying disease," said John A. Scarlett, M.D., Geron's President and Chief Executive Officer. "As a consequence, we believe that imetelstat may have potential as a treatment for other hematologic myeloid malignancies, including myelofibrosis."

Based on data from the trial of imetelstat in patients with ET, in November 2012, Dr. Ayalew Tefferi at Mayo Clinic initiated an investigator-sponsored trial to evaluate the safety and efficacy of imetelstat in patients with MF and to determine an appropriate dose and schedule for further evaluation. For more information about this trial, please refer to http://clinicaltrials.gov/ct2/show/NCT01731951. Dr. Tefferi has communicated to Geron that enrollment of the first cohort of 11 patients in the study was completed at the end of March 2013 and that the pre-specified criteria in the clinical protocol of at least two responders with a clinical

improvement (CI), partial remission (PR) or complete remission (CR) according to the International Working Group for Myelofibrosis Research and Treatment (IWG-MRT) criteria in the first 11 patients was met to enable expanded enrollment. In the first cohort of 11 patients with MF, imetelstat was administered once every three weeks. In the second cohort of an additional 11 patients with MF, imetelstat initially will be administered weekly during a four week induction phase, followed by a maintenance regimen in which imetelstat is given once every three weeks. Geron expects data from the investigator-sponsored trial, if positive, to inform the design of a company-sponsored multi-center trial in MF.

Geron also intends to expand its directed program of investigator-sponsored trials in 2013 to other hematologic myeloid indications, including AML and MDS.

20.   On August 8, 2013, the Company issued a press release entitled, "Geron Corporation Reports Second Quarter 2013 Financial Results."   Therein, the Company, in relevant part, stated:

**Company Events**

***Proof-of-Concept Trial in Essential Thrombocythemia.*** In June 2013, Geron presented updated clinical results from the Phase 2 trial of imetelstat in patients with essential thrombocythemia (ET) at the Congress of the European Hematology Association (EHA). The data showed durable hematologic and molecular responses in patients, suggesting that imetelstat inhibited, in a relatively selective manner, the progenitor cells of a malignant clone believed to be responsible for the underlying disease. The Phase 2 trial of imetelstat in ET is no longer enrolling new patients, but the company continues to treat and follow patients previously enrolled in the trial. The rationale for studying imetelstat in ET was to provide proof-of-concept for further development of imetelstat in a broader range of hematologic myeloid malignancies, including myelofibrosis (MF), where there is a clear unmet medical need for a product that could be disease-modifying.

***Investigator-Sponsored Trial in Myelofibrosis.*** Based on data from the Phase 2 clinical trial of imetelstat in patients with ET, in November 2012, Dr. Ayalew Tefferi at Mayo Clinic initiated an investigator-sponsored trial (IST) to evaluate the safety and efficacy of imetelstat in patients with myelofibrosis (MF) and to determine an appropriate dose and schedule for further evaluation. The trial is an open-label study in patients with primary MF, post-essential thrombocythemia MF or post-polycythemia vera MF who have two to three risk factors (intermediate-2) or four or more risk factors (high risk) as defined by the Dynamic International Prognostic Scoring System Plus (DIPSS Plus) described by Gangat, et al, in the Journal of Clinical Oncology (2011). The primary endpoint is overall response rate, which is defined by the proportion of patients

who are classified as responders having achieved either a clinical improvement, partial remission, or complete remission according to the International Working Group for Myelofibrosis Research and Treatment (IWG-MRT) criteria. Secondary endpoints include reduction of spleen size, transfusion independence, safety and tolerability.

The investigator has provided the following communications to Geron regarding the status of the IST in MF:

- Enrollment of the first cohort of 11 patients in which the dose of imetelstat was given once every three weeks was completed at the end of March 2013;

- Pre-specified criteria in the clinical protocol of at least two responders in the first cohort were met to enable expanded enrollment;

- Enrollment of the second cohort of 11 patients in which the dose intensity of imetelstat was increased to levels similar to those used in the ET trial was completed at the end of May 2013;

- Pre-specified criteria in the clinical protocol of at least two responders in the second cohort were met to enable further expanded enrollment;

- Additional cohorts to enable continued testing of the effect of different dosing intensities of imetelstat are being considered by the investigator; and

- A protocol amendment to add a new cohort of 11 patients with MF that has transformed into acute myelogenous leukemia, known as blast-phase MF, was recently approved by the Mayo Clinic Institutional Review Board.

Data from this IST, if positive, will inform any future Geron-sponsored clinical trial in patients with MF.

21.     On August 8, 2013, Geron filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Scarlett and Bloom, and reaffirmed the Company's financial results previously announced that day.  Additionally, the Company's Form 10-Q, in relevant, part stated:

***Development of Imetelstat in Hematologic Myeloid Malignancies***

Top-line data from the essential thrombocythemia, or ET, Phase 2 trial that we presented at the American Society of Hematology, or ASH, annual meeting in December 2012 and at the Congress of the European Hematology Association in June 2013 showed durable hematologic and molecular responses in patients enrolled in the ET Phase 2 trial, suggesting that imetelstat inhibited the progenitor cells of the malignant clone believed to be responsible for the underlying disease in a relatively selective manner. The Phase 2 trial of imetelstat in ET is no longer enrolling patients, and we are continuing to treat and follow patients previously enrolled in the trial. Our rationale for studying imetelstat in ET was to provide proof-of-concept for further development of imetelstat in a broader range of hematologic myeloid malignancies. Although high hematologic and molecular response rates led us to explore the feasibility of further development of imetelstat in ET, medical experts have advised us that ET patients are adequately served by existing therapies and recommended that we pursue other hematologic malignancies, such as MF, where there is a clear unmet medical need for a product that could be disease-modifying.

22.     On November 7, 2013, the Company issued a press release entitled, "Geron Corporation Reports Third Quarter 2013 Financial Results."  Therein, the Company, in relevant part, stated:

**Company Events**

- *Investigator-Sponsored Trial in Myelofibrosis.* In November 2012, Dr. Ayalew Tefferi at Mayo Clinic initiated an investigator-sponsored trial (IST) to evaluate the safety and efficacy of imetelstat in patients with myelofibrosis (MF) and to determine an appropriate dose and schedule for further evaluation. The trial is an open-label study in patients with primary MF, post-essential thrombocythemia MF or post-polycythemia vera MF who have two to three risk factors (intermediate-2) or four or more risk factors (high risk) as defined by the Dynamic International Prognostic Scoring System Plus (DIPSS Plus) described by Gangat, et al, in the Journal of Clinical Oncology (2011). The primary endpoint is overall response rate, which is defined by the proportion of patients who are classified as "responders", which means that they have achieved either a clinical improvement (CI), partial remission (PR) or complete remission (CR), consistent with the criteria of the 2013 International Working Group for Myeloproliferative Neoplasms Research and Treatment (IWG-MRT). Secondary endpoints include reduction of spleen size, improvement in anemia or inducement of red blood cell transfusion independence, safety and tolerability.

The investigator has informed Geron that more than fifty patients have been enrolled in the IST. Enrollment of the first 11 patients in the first

cohort of MF patients (Cohort A) in which the dose of imetelstat is given once every three weeks was completed at the end of March 2013 and the pre-specified criteria in the clinical protocol of at least two responders in the first 11 patients were met to enable expanded enrollment. Enrollment of the first 11 patients of the second cohort of MF patients (Cohort B) in which imetelstat was given weekly for four weeks, followed by one dose every three weeks, was completed in May 2013 and the pre-specified criteria in the clinical protocol of at least two responders in the first 11 patients were met to enable expanded enrollment. In addition, the investigator has informed the company that enrollment has commenced in additional cohorts to evaluate the safety and efficacy of imetelstat using different dosing algorithms, as well as to evaluate imetelstat in different patient populations, including patients with MF that has transformed into AML, or blast-phase MF, and certain subpopulations of myelodysplastic syndromes/myeloproliferative neoplasms (MDS/MPN), or MDS.

Certain preliminary data from patients enrolled in Cohort A and Cohort B of the ongoing IST have been selected for presentation in an oral session at the 55th American Society of Hematology (ASH) Annual Meeting and Exposition to be held in New Orleans, Louisiana from December 7-10, 2013. The presentation is scheduled to occur on Monday, December 9, 2013 at 4:45 p.m. CST. The preliminary data selected by the investigator was submitted as an abstract by the investigator to ASH in August 2013.

John A. Scarlett, M.D., Geron's Chief Executive Officer commented, "Pending additional input from regulators, investigators and other experts, as well as further potential insights from the ongoing IST, we expect to initiate a Geron-sponsored, multi-center trial of imetelstat in MF in the first half of 2014."

- *Completion of Divestiture of Human Embryonic Stem Cell Assets.* On October 1, 2013, the transaction to divest Geron's human embryonic stem cell assets pursuant to the terms of the previously announced Asset Contribution Agreement that was entered into in January 2013 with BioTime, Inc. and BioTime's subsidiary, Asterias Biotherapeutics, Inc. (formerly known as BioTime Acquisition Corporation) was completed.

23. On November 7, 2013, Geron filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter. The Company's Form 10-Q was signed by Defendants Scarlett and Bloom, and reaffirmed the Company's financial results previously announced that day. Additionally, the Company's Form 10-Q, in relevant part, stated:

*Development of Imetelstat in Hematologic Myeloid Malignancies*

In November 2012, Dr. Ayalew Tefferi of Mayo Clinic initiated an investigator-sponsored trial to evaluate the safety and efficacy of imetelstat in patients with MF, and to determine an appropriate dose and schedule for further evaluation. This investigator-sponsored trial, or the Myelofibrosis IST, is an open-label trial in patients with PMF, post-ET MF, or post-PV MF who have two to three risk factors (intermediate-2) or four or more risk factors (high risk) as defined by the Dynamic International Prognostic Scoring System Plus, or DIPSS Plus, described by Gangat, et al, in the Journal of Clinical Oncology (2011). The primary endpoint is overall response rate, which is defined by the proportion of patients who are classified as "responders", which means that they have achieved either a clinical improvement, or CI, partial remission, or PR, or complete remission, or CR, consistent with the criteria of the 2013 International Working Group for Myeloproliferative Neoplasms Research and Treatment, or IWG-MRT (Tefferi, et al., Blood 2013). Secondary endpoints include reduction of spleen size, improvement in anemia or inducement of red blood cell transfusion independence, safety and tolerability.

The investigator has informed us that more than fifty patients have been enrolled in the Myelofibrosis IST. Enrollment of the first 11 patients in the first cohort of MF patients (Cohort A) in which the dose of imetelstat is given once every three weeks was completed at the end of March 2013 and the pre-specified criteria in the clinical protocol of at least two responders in the first 11 patients were met to enable expanded enrollment. Enrollment of the first 11 patients of the second cohort of MF patients (Cohort B) in which imetelstat was given weekly for four weeks, followed by one dose every three weeks was completed in May 2013 and the pre-specified criteria in the clinical protocol of at least two responders in the first 11 patients were met to enable expanded enrollment. In addition, the investigator has informed us that enrollment has commenced in additional cohorts to evaluate the safety and efficacy of imetelstat using different dosing algorithms, as well as to evaluate imetelstat in different patient populations, including patients with MF that has transformed into AML, or blast-phase MF, and certain subpopulations of myelodysplastic syndromes/myeloproliferative neoplasms (MDS/MPN), or MDS. We may determine to initiate pilot studies in other hematologic myeloid malignancies, including MDS and/or AML.

24.    On January 30, 2014, Geron filed a Prospectus Supplement with the SEC on Form 424B5 for a public offering of common stock.  Therein, in relevant part, the Company stated:

**Developing Imetelstat to Treat Hematologic Myeloid Malignancies**

***Proof-of-Concept in Essential Thrombocythemia***

Myeloproliferative neoplasms, or MPNs, are hematologic myeloid malignancies that arise from malignant hematopoietic myeloid progenitor cells in the bone

marrow, such as the precursor cells of red blood cells, platelets and granulocytes. Proliferation of malignant progenitor cells leads to an overproduction of any combination of myeloid white cells, red blood cells and/or platelets, depending on the disease. These overproduced cells may also be abnormal, leading to additional clinical complications. MPN diseases include PV, ET and MF. ET is an MPN characterized by a high platelet count, often accompanied by a high white cell count, and an increased risk of thrombosis, or bleeding, in higher-risk patients.

In January 2011, we initiated a Phase 2 clinical trial of imetelstat in patients with ET. The Phase 2 ET trial was a multi-center, single arm, and open-label trial that we designed to provide proof-of-concept for the potential use of imetelstat as a treatment for hematologic myeloid malignancies, including MF, MDS and AML. The trial leveraged clinical observations from Phase 1 trials suggesting that imetelstat reduces platelet counts, as well as non-clinical observations that imetelstat distributes well to bone marrow in rodent models and selectively inhibits the proliferation of malignant progenitors ex vivo from patients with ET. Hematologic responses were measured by reductions in platelet counts, and molecular responses were measured by reductions in the JAK2 V617F mutant allele burden in circulating granulocytes as assessed by reduction in the proportion of the abnormal Janus kinase 2, or JAK2, gene compared to the normal, or wild type JAK2 gene. We believe a decrease in the proportion of the JAK2 V617F mutant relative to the wild type JAK2 is consistent with selective inhibition of the malignant progenitor cells responsible for the disease.

We presented top-line data from the Phase 2 ET clinical trial at the American Society of Hematology, or ASH, annual meeting in December 2012 and at the Congress of the European Hematology Association, or EHA, in June 2013. A total of 18 ET patients were enrolled into the study. Imetelstat induced platelet count reductions in all patients (a 100% hematologic response rate) and normalizations in 16 out of 18 patients (an 89% complete response rate). The JAK2 V617F gene mutation was detected in eight patients at baseline. Seven out of the eight (88%) patients achieved 72% to 96% reductions in JAK2 V617F allele burden that qualified as partial molecular responses within three to 12 months of treatment with imetelstat. Partial molecular responses were maintained in six of the seven (86%) patients, with a median follow-up of 9.5 months (range 0 to 19 months) after first achieving a response. As of the EHA Meeting in June 2013, the median durations of hematologic and molecular response had not yet been reached. Currently, 11 patients remain on-study in the Phase 2 ET trial, with the longest duration on-study being three years. These data suggest that imetelstat inhibits the progenitor cells of the malignant clone believed to be responsible for the underlying disease in a relatively selective manner.

In the Phase 2 ET trial, long-term administration of imetelstat was generally well tolerated. One patient discontinued the trial due to drug-related Grade 1 and 2 constitutional adverse events and Grade 1 gastrointestinal adverse events. The majority of the non-hematologic adverse events were mild to moderate in

severity, with the most frequently assessed imetelstat-related adverse events reported by investigators being gastrointestinal events and fatigue. No drug-related Grade 4 non-hematologic adverse events were reported.

Three patients had Grade 4 neutropenia, but no cases of febrile neutropenia have been reported. No thromboembolic events or bleeding events associated with thrombocytopenia have been reported.

At least one abnormal liver function test, or LFT, was observed in laboratory findings in all patients. The majority were Grade 1 elevations in alanine aminotransferase, or ALT, and aspartate aminotransferase, or AST; two Grade 3 increases in ALT/AST were reversible on dose reduction. With longer dosing, Grade 1 increases in alkaline phosphatase were observed, associated with mostly Grade 1 to some Grade 2 unconjugated hyperbilirubinemia. LFT abnormalities do not appear to progressively worsen over time.

Although the Phase 2 ET trial is no longer enrolling patients, we are continuing to treat and follow the remaining patients on study. The high hematologic and molecular response rates led us to explore the feasibility of further development of imetelstat in ET. However, based on our own analysis and after consulting with medical experts, we plan to pursue other hematologic myeloid malignancies, such as MF, where there is an unmet medical need for a product that could potentially be disease-modifying.

25.     The statements contained in ¶¶19-24 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that persistent low-grade LFT abnormalities had been observed in the Phase 2 study of imetelstat in ET/PV patients; (2) that there was a potential risk of chronic liver injury following long-term exposure to imetelstat; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company and the prospects for imetelstat lacked any reasonable basis and/or were materially false and misleading at all relevant times.

**Disclosures at the End of the Class Period**

26.     On March 12, 2014, the Company issued a press release entitled, "Geron Announces IND Clinical Hold Affecting Clinical Trials of Imetelstat in Essential Thrombocythemia and Multiple Myeloma."  Therein, the Company, in relevant part, stated:

Geron Corporation (Nasdaq: GERN) announced today that **the company has received verbal notice from the U.S. Food and Drug Administration (FDA) that its Investigational New Drug (IND) application for imetelstat has been placed on full clinical hold, affecting all ongoing company-sponsored clinical trials.** A full clinical hold is an order that the FDA issues to a trial sponsor to suspend an ongoing clinical trial or delay a proposed trial.

The clinical hold affects the remaining eight patients in the company's Phase 2 study in essential thrombocythemia (ET) or polycythemia vera (PV) and the remaining two patients in the company's Phase 2 study in multiple myeloma. In addition, the company's planned Phase 2 clinical trial in myelofibrosis will likely be delayed due to the clinical hold. It is possible that other studies using imetelstat, such as ongoing investigator-sponsored trials, may also be placed on clinical hold by the FDA.

Geron has not yet received written notice of its clinical hold from the FDA, but based on the verbal communication yesterday afternoon**, the FDA indicated that the clinical hold is due to the occurrence of persistent low-grade liver function test (LFT) abnormalities observed in the Phase 2 study of imetelstat in ET/PV patients and the potential risk of chronic liver injury following long-term exposure to imetelstat. The FDA expressed concern about whether these LFT abnormalities are reversible.** Geron plans to work diligently with the FDA to seek the release of the clinical hold.

(Emphases added).

27.    On this news, shares of Geron declined $2.71 per share, more than 61%, to close at $1.69 per share on March 12, 2014, on unusually heavy volume.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Geron's securities between February 1, 2012 and March 11, 2014, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Geron's securities were actively traded on the NASDAQ Stock Market ("NASDAQ").   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Millions of Geron shares were traded publicly during the Class Period on the NASDAQ.   As of November 1, 2013, Geron had 128,967,411 shares of common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Geron; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.     The market for Geron's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Geron's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Geron's securities relying upon the integrity of the market price of the Company's securities and market information relating to Geron, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Geron's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Geron's business, operations, and prospects as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Geron's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

37.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38.     During the Class Period, Plaintiff and the Class purchased Geron's securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Geron, his/her control over, and/or receipt and/or modification of Geron's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Geron, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for Geron's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Geron's securities traded at artificially inflated prices during the Class Period.   On December 5, 2013, the Company's stock closed at a Class Period high of $5.87 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Geron's securities and market information relating to Geron, and have been damaged thereby.

41.     During the Class Period, the artificial inflation of Geron's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Geron's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Geron and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class

Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.     At all relevant times, the market for Geron's securities was an efficient market for the following reasons, among others:

(a)     Geron stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Geron filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Geron regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Geron was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

43.     As a result of the foregoing, the market for Geron's securities promptly digested current information regarding Geron from all publicly available sources and reflected such information in Geron's stock price. Under these circumstances, all purchasers of Geron's securities during the Class Period suffered similar injury through their purchase of Geron's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Geron who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

45.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Geron's securities at artificially inflated prices.   In

1   furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

2   took the actions set forth herein.

3      47.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

4   untrue statements of material fact and/or omitted to state material facts necessary to make the

5   statements not misleading; and (iii) engaged in acts, practices, and a course of business which

6   operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

7   maintain artificially high market prices for Geron's securities in violation of Section 10(b) of the

8   Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the

9   wrongful and illegal conduct charged herein or as controlling persons as alleged below.

10

11     48.    Defendants, individually and in concert, directly and indirectly, by the use, means

12  or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

13  continuous course of conduct to conceal adverse material information about Geron's financial

14  well-being and prospects, as specified herein.

15

16     49.    These defendants employed devices, schemes and artifices to defraud, while in

17  possession of material adverse non-public information and engaged in acts, practices, and a

18  course of conduct as alleged herein in an effort to assure investors of Geron's value and

19  performance and continued substantial growth, which included the making of, or the

20  participation in the making of, untrue statements of material facts and/or omitting to state

21  material facts necessary in order to make the statements made about Geron and its business

22  operations and future prospects in light of the circumstances under which they were made, not

23  misleading, as set forth more particularly herein, and engaged in transactions, practices and a

24  course of business which operated as a fraud and deceit upon the purchasers of the Company's

25  securities during the Class Period.

26

27

28

50.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

51.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Geron's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Geron's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Geron's securities during the Class Period at artificially high prices and were damaged thereby.

53.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Geron was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Geron securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    The Individual Defendants acted as controlling persons of Geron within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.    As set forth above, Geron and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct,

1  Plaintiff and other members of the Class suffered damages in connection with their purchases of

2  the Company's securities during the Class Period.

3  **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiff prays for relief and judgment, as follows:

5

6  (a)    Determining that this action is a proper class action under Rule 23 of the Federal

7  Rules of Civil Procedure;

8  (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

9  members against all defendants, jointly and severally, for all damages sustained as a result of

10  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

11  (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

12  this action, including counsel fees and expert fees; and

13

14  (d)    Such other and further relief as the Court may deem just and proper.

15  **JURY TRIAL DEMANDED**

16

17  Plaintiff hereby demands a trial by jury.

18  DATED: March 14, 2014                    GLANCY BINKOW & GOLDBERG LLP

19

20                                          By: *s/Lionel Z. Glancy*
                                            Lionel Z. Glancy
21                                          Michael Goldberg
                                            Robert V. Prongay
22                                          Elaine Chang
                                            1925 Century Park East, Suite 2100
23                                          Los Angeles, California 90067
                                            Telephone: (310) 201-9150
24                                          Facsimile:  (310) 201-9160

25

26

27

28

LAW OFFICES OF HOWARD G. SMITH
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Counsel for Plaintiff Rohan Kishtagari*

### SWORN CERTIFICATION OF PLAINTIFF

Geron Corporation, **SECURITIES LITIGATION**

I, Rohan Kishtagari, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Geron Corporation, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions Geron Corporation, during the class period set forth in the Complaint are as follows.

    See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ___ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:  03/14/2014

_____
(Please Sign Your Name Above)

**Rohan Kishtagari's Transactions in Geron Corporation**

| Date | Transaction Type | Ticker | Company | Shares | Price | Amount |
|------|------------------|--------|---------|--------|-------|--------|
| 3/3/2014 | Purchase | GERN | Geron Corporation | 300 | 4.6700 | $ 1,401.00 |
| 3/3/2014 | Purchase | GERN | Geron Corporation | 3,700 | 4.6699 | $ 17,278.63 |
| 3/4/2014 | Purchase | GERN | Geron Corporation | 1,500 | 4.8000 | $ 7,200.00 |
| 3/4/2014 | Purchase | GERN | Geron Corporation | 2,500 | 4.7999 | $ 11,999.75 |
| 3/7/2014 | Purchase | GERN | Geron Corporation | 250 | 4.3199 | $ 1,079.98 |
| 3/10/2014 | Purchase | GERN | Geron Corporation | 5,800 | 4.4890 | $ 26,036.20 |
| 3/10/2014 | Purchase | GERN | Geron Corporation | 11,200 | 4.4900 | $ 50,288.00 |
| 3/10/2014 | Purchase | GERN | Geron Corporation | 1,000 | 4.5000 | $ 4,500.00 |
| | | | | | | |
| 3/12/2014 | Sale | GERN | Geron Corporation | 4,000 | 1.6200 | $ 6,480.00 |
| 3/12/2014 | Sale | GERN | Geron Corporation | 21,250 | 1.6200 | $ 34,425.00 |
| 3/12/2014 | Sale | GERN | Geron Corporation | 1,000 | 1.6200 | $ 1,620.00 |